UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE

WILLIAM AND SUSAN HARDY                              CASE NO. 09-51121

DEBTORS

DERMOT AND HILARY HALPIN                                  PLAINTIFFS

V.                                                    ADV. NO. 09-5113

WILLIAM HARDY                                             DEFENDANT

MEMORANDUM OPINION

The Plaintiffs Dermot and Hilary Halpin brought this adversary proceeding to declare an

obligation of the Debtor Defendant William Hardy non-dischargeable under 11 U.S.C.

§ 523(a)(2)(A).  A trial was held on June 8-10, 2016, and the matter is ripe for a decision.  The

subject debt is dischargeable upon consideration of the parties' stipulation of facts, arguments,

testimony and exhibits admitted into evidence, and the record.  The Plaintiffs have not satisfied

their burden to prove false pretenses, a false representation, or actual fraud by a preponderance

of the evidence.

I.    **FACTS.**

The following facts are based on the parties' stipulations [ECF No. 54, 187] and the

testimony and evidence presented at trial.

A.    **The Purchase of a ReVox E-650 Television.**

In March 2002, the Halpins were in the market for a wall-mounted plasma television

screen and home entertainment system.  At the time, David Powers, d/b/a Better Home

1

Technology and Better Home Tech., Inc. ("Powers"), was helping the Halpins construct a basement theater room.  Powers suggested the Halpins consult with the Debtor and Defendant, Bill Hardy, who operated a high-end audio-visual shop in Lexington, Kentucky, known as Bill Hardy Stereo.

Powers relayed the Halpins' interest in a television to Hardy.  Powers testified that he explained to Hardy that the Halpins were interested in a flat screen television similar to the appearance of a brand known as Bang and Olufsen, which Powers further described as "non-traditional," "modern," and "European."  Powers told Hardy that they wanted the television to watch movies and occasional sporting events.

The only product that Hardy sold that would meet the Halpins' requirements was manufactured by a Swiss company called ReVox.  Hardy researched ReVox's products and spoke to Brian Tucker, the representative for ReVox USA, Inc. ("Tucker"), before deciding that the ReVox E-650 50-inch plasma screen, and certain other necessary accessories, would satisfy the Halpins' needs.

Hardy met with Ms. Halpin in March 2002 for approximately 15-30 minutes.  Hardy testified that his understanding from the conversation with Ms. Halpin and his conversations with Powers is that the Halpins wanted a 50-inch plasma flat panel television system to primarily view DVDs and occasional sporting events.  He believed at the time that the appearance of the television was very important to the Halpins.  Hardy gave Ms. Halpin a copy of the brochure with the ReVox E-642/E-650 specifications [Def. Ex. 1 at ECF No. 179-1] for the Halpins to consider and then contacted Tucker to relay what he learned.

 The Halpins thereafter traveled to Chicago to examine several televisions manufactured by Panasonic, Pioneer, and Bang and Olufsen.  They did not purchase a television in Chicago

and sometime shortly before or during this trip, Ms. Halpin spoke with Tucker about viewing the ReVox product.  Tucker did not have a ReVox E-650 available at the time.

Hardy worked with Tucker to set up a demonstration of the ReVox E-642, a 42-inch television that had the same resolution as the ReVox E-650, in Lexington.   There is much dispute about what representations were made by whom and to whom during the approximately three hour demonstration at Hardy's shop in March 2002.  What is clear from the evidence is that everyone at the demonstration – the Halpins, Hardy, Tucker, and Powers – understood the Halpins were looking for the best available, state-of-the-art 50-inch plasma television.  Hardy and Tucker testified that they believed the ReVox E-650 and its components met the Halpins' requirements based on a variety of features including, but not limited to, its plasma screen, modular design that allowed repairs or upgrades in the field, and ReVox's 100% no dead pixel guarantee.

The Halpins testified that their request also included a request for a television screen that was high definition.  Hardy, Tucker and Powers testified that they do not recall the Halpins specifically asking for a high definition television screen.  That said, Hardy explained that his understanding of the Halpins' request for the best available, state-of-the-art product is that the television must include a high definition component, particularly since high definition was the emerging technology at the time.

Hardy testified that a high definition television screen is a television that displays 720p resolution or higher.  The native resolution of the ReVox E-650 (and the ReVox E-642) was only 480p.  The ReVox E-650 could display a high definition signal broadcast in a higher resolution, but only in its native resolution of 480p.  Further, a high definition tuner purchased or provided by cable or satellite companies was required to convert the high definition resolution of 720p or

higher to a lower native resolution screen.  Based on this, the ReVox E-650 was not a high

definition television screen, although it was capable of receiving and displaying a high definition

signal with the aid of an HD tuner.

The testimony shows that the Halpins understood at the time of the demonstration that

they were not viewing the ReVox E-650, but the ReVox E-642.  They further understood that no

cable or other broadcast signal was available at Bill Hardy Stereo due to ongoing renovations.

Instead, the Halpins were shown a DVD on the ReVox E-642.  Although the ReVox E-650 only

had a native resolution of 480p, Hardy testified that he believed it best met the Halpins' needs

because they primarily intended to use the television to watch DVDs, which were produced in a

480p resolution at that time.

During the March demonstration, the parties discussed the Halpins' ability to view the

few shows broadcast in high definition in 2002.  Hardy testified that he explained to the Halpins

that they would need to purchase an HD tuner or obtain one through a satellite provider or cable

company if they wanted to watch high definition television.  When asked if he told the Halpins

they could watch television shows in high definition, Hardy testified that he explained the

ReVox E-650 would only display the high definition signal in 480p, which is its native

resolution.   Powers and Tucker provided consistent testimony.  Regardless, the Halpins testified

their understanding was that the ReVox E-650 was a high definition television screen.

The Halpins decided to proceed with the purchase from Hardy that included the ReVox

E-650 and related equipment.  The Halpins reviewed several proposals from Hardy [Def. Ex. 12

at ECF No. 179-13; Pl. Ex. 2 at ECF No. 175-2] before purchasing the ReVox E-650.  These

proposals included component cables for "hdtv transmission" and an "hdtv breakout."  They did

not include an HD tuner.  The Halpins did not purchase an HD tuner from Hardy but ultimately

purchased and installed the "hdtv transmission" component cables that would make it possible

for the Halpins to receive high definition transmission in the event the Halpins eventually

purchased an HD tuner.  The Halpins ultimately paid Hardy $43,161.69 for the entire system.

[Pl. Ex. 3 at ECF No. 174-3.]

Powers installed the ReVox E-650 and related equipment in June 2002.  After installation,

the Halpins did not like the picture quality.  Ms. Halpin testified she attended a parade of homes tour

during the summer and viewed a Panasonic television that she believed displayed a better picture

than the ReVox E-650.  When she raised this issue, she learned the picture quality of the Panasonic

was the result of a high definition satellite signal and Powers and Hardy informed her that she needed

to purchase an HD tuner or obtain one through the cable company or a satellite provider to get a

similar result.

Tucker, Hardy and Powers went to the Halpins' home in early August 2002 to perform a

software upgrade to the ReVox E-650.  Hardy had not visited the home nor seen the installed system

before this time.  Except for the March meetings at Hardy's store, and possibly a phone call,

communications regarding the system and delivery of the proposals were conducted through Powers.

Tucker, Hardy and Powers all testified the only complaint they were then aware of related to the

picture quality that was fixable with an HD tuner.  Dr. Halpin and his Father testified that they could

not watch a soccer match on the ReVox E-650 after the initial installation because of the poor picture

quality.  Therefore, the Halpins alleged that the August meeting was conducted, in part, to address

their picture quality problems.  The Halpins each testified they were on a wait list for an HD tuner as

early as July 2002, although Hardy and Powers testified that Ms. Halpin did not agree to order an HD

tuner until November 2002.

During the August visit, Hardy noticed a line running up the screen when DVDs were played, called "AC line noise."  Hardy explained that AC line noise is normally introduced by outside interference.  Hardy, in his store, and Powers, at the Halpins' home, spent several hours attempting to determine the cause of the AC line noise by isolating potential sources of interference.  They could not find the problem, so Hardy contacted Tucker to see if ReVox could solve the issue.  The ReVox engineers could not recreate the problem offsite, so ReVox eventually agreed to replace the power pack on the back of the ReVox E-650.

Hardy, Tucker and Powers met at the Halpins' home in November 2002 to install the new power pack.  Dr. Halpin expressed his displeasure with the system and initially refused to let Hardy and Tucker enter his home.  He eventually relented and the power pack was replaced.  Hardy, Tucker, and Powers testified that this resolved the AC line noise and they believed the Halpins were satisfied with the fix.

This did not, however, satisfy the Halpins.  In November 2002, Marcus Halbig, Product Manager for ReVox GMBH in Germany, sent a letter to Dr. Halpin dated November 13, 2002 (the "Halbig Letter") to address their continuing dissatisfaction.  [Def. Ex. 10 at ECF No. 179-10.]  The Halbig Letter was faxed to Tucker, who then sent it to Hardy, who gave the letter to Powers for delivery.  The exact date of delivery is unclear.   The Halbig Letter provided: "Europe does not have a high definition program from their TV broadcast network and therefore [ReVox] have (*sic*) not put high priority [on] marketing an HD plasma product."  The company offered to replace the ReVox E-650 with a "'state-of-the-art' 50" HD product."  The letter concludes by stating:  "We at ReVox hope you will give us the opportunity . . . by accepting our new High Definition model in exchange for the E-650 that you presently have."

On November 18, 2002, Dr. Halpin sent a letter to Hardy seeking removal of the

television system and a refund of $47,425.88 ("the Halpin Letter").  [Def. Ex. 9 at ECF No.

179-9.]  The Halpin Letter indicates that the week prior, Dr. Halpin also told Tucker and Hardy

that he wanted the television system removed.  The Halpin Letter does not specifically place

blame on Hardy nor does it refer to the failure to provide the Halpins with a high definition

television screen.  Hardy refused to provide the requested refund.

**B.**       **The First Judgment in the 2003 State Court Action.**

On March 25, 2003, the Halpins filed Fayette Civil Action No. 03-CI-1249 (the "2003

Case") against Bill Hardy d/b/a Bill Hardy Stereo, ReVox U.S.A., Inc., Powers, d/b/a Better

Home Technology, and Better Home Tech, Inc.  [Def. Ex. 32 at ECF No. 179-24.]  The 2003

Case alleged false, misleading and deceptive actions under the Kentucky Consumer Protection

Act, K.R.S. § 367.110 ("KCPA").  The 2003 Case was tried before a jury in May 2005.  The jury

returned a verdict in favor of the Halpins, awarding $43,161.69 in compensatory damages and

$5,000 in punitive damages, jointly and severally against all defendants.  In July 2005, the state

court entered a Judgment for the compensatory and punitive damages awarded by the jury plus

$75,223.66 in attorneys' fees, $7,727.30 in costs, and $10,004.37 in prejudgment interest, for a

total obligation of $141,117.02 (the "First 2003 Judgment").  Hardy appealed.

Despite the appeal, Hardy satisfied the First 2003 Judgment on or about May 6, 2006, by

payment of $154,897.82, which included post-judgment interest (the "Judgment Payoff").  The

funds for the Judgment Payoff were provided by Joe Graviss, who was repaid in July 2006 with

proceeds from a loan from Forcht Bank (formerly First National Bank of Lexington) to Bill and

Susan Hardy.

C.      **The 2005 State Court Action**.

On or about August 6, 2005, prior to the payoff of the First 2003 Judgment, the Halpins

filed Fayette Civil Action No. 05-CI-3390 (the "2005 Case") against Hardy, Susan Hardy, his

wife, and E. David Marshall, their lawyer.  The 2005 Case alleged the parties were involved in

improper actions to hide assets, including fraudulent conveyances.  The Halpins sought and

obtained a Restraining Order from the Fayette Circuit Court enjoining Hardy from transferring

any of his assets pending further orders of the state court.

The state court later consolidated the 2003 Case and the 2005 Case.  In January 2006, the

Fayette Circuit Court converted the August 6, 2005 Restraining Order to a Temporary

Injunction.  The state court lifted the Temporary Injunction when Hardy made the Judgment

Payoff.  Despite the payoff, the Halpins continued to pursue recovery of legal fees incurred in the

2005 Case.

D.      **Reversal of the First 2003 Judgment and Second Trial in the 2003 Case**.

The Kentucky Court of Appeals reversed the First 2003 Judgment and remanded the case

to the Fayette Circuit Court in April 2007.  This decision was appealed, but the Kentucky

Supreme Court denied discretionary review in September 2008.

On April 9, 2007, after the Court of Appeals decision, Hardy moved the Fayette Circuit

Court to refund the Judgment Payoff.  The Fayette Circuit Court denied the Motion.  On

September 12, 2008, after the Kentucky Supreme Court decision, Hardy again moved the Fayette

Circuit Court to refund the Judgment Payoff.  The Fayette Circuit Court once more denied the

motion and, in addition, appointed the Halpins as special bailees of the Judgment Payoff.  The

Halpins posted a $2,500.00 bond.

8

The 2003 Case was retried before a jury in March 2009.  On March 24, 2009, the jury returned a verdict in favor of the Halpins against Hardy in the amount of $38,451.91 in compensatory damages.  The jury did not award punitive damages.  On August 9, 2010, the Fayette Circuit Court entered a "draft" judgment, which memorialized the decisions orally announced from the bench at a hearing on August 6, 2010.  The state court did not issue detailed findings of fact or conclusions of law pending entry of a final judgment.

On June 14, 2011, the state court entered a final judgment in the 2003 Case that included compensatory damages, attorneys' fees and costs in the amount of $157,398.45 (the "Judgment Debt").  [Pl. Ex. 6 at ECF No. 175-9.]  The state court then offset the Judgment Debt against the Judgment Payoff, resulting in a net amount due to Hardy of $7,098.76.  The final judgment awarding the Judgment Debt was appealed.

On September 19, 2014, the Kentucky Court of Appeals affirmed the Judgment Debt but reversed the state trial court's offset of the Judgment Payoff and ordered the Halpins to repay the Judgment Payoff to Hardy.  The repayment requirement included prejudgment interest from the date of payment to the date of reversal of the first judgment, and then post-judgment interest after that date until the date of payment.  The Kentucky Supreme Court refused to grant discretionary review of the appellate court's decision, and the Halpins paid $407,000.00 into an escrow account for Hardy in January 2015.[1]

---

[1] The bankruptcy court ordered the release of the money to Hardy in December 2015 because it no longer had jurisdiction over the funds.  [Main Case ECF No. 144.]

E.    **The Chapter 7 Bankruptcy Case**.

Susan and Bill Hardy filed their Chapter 7 bankruptcy petition on April 9, 2009.  On

August 11, 2009, this Court entered an order lifting the automatic stay to permit the 2003 Case

and 2005 Case to proceed in state court.  [Main Case, ECF No. 34.]

On August 31, 2009, the Halpins filed this adversary proceeding raising the same claims

of fraudulent conveyance that were presented to the state court in the 2005 Case and seeking

non-dischargeability of the Judgment Debt (which was not yet reduced to judgment).

The initial trial date was set for December 9, 2009 [ECF No. 3], but was moved several

times to accommodate joint requests by the parties and to allow arguments on dispositive

motions.  [*See* ECF Nos. 3, 12, 23, 24, 41, 43, 60.]  The parties stipulated to the admissibility of

multiple exhibits prior to the dispositive motion hearing date.  [ECF No. 56.]  After argument on

the motions for summary judgment, the parties' joint motion to hold all trial deadlines in

abeyance was granted pending a ruling on the motions.  [ECF Nos. 73-74.]

On March 18, 2011, the requests for summary judgment were denied.  The Court

concluded that a draft judgment[2] from the state court does not have preclusive effect.  [ECF

No. 75.]  The Court further determined that "the issue of whether the Defendants had an intent to

defraud pursuant to 11 U.S.C. § 523(a)(2)(A) is a genuine issue of material fact that may not be

resolved by summary judgment."  [*Id.* at 4.]

The order denying summary judgment also held the adversary proceeding in abeyance

pending final resolution of the appeals in the 2003 Case.  [*Id.*]  The parties were required to file

status reports every ninety days.  [ECF No. 76.]  The bankruptcy court reiterated its direction that

the matter would remain in abeyance pending a final resolution in the state court after the

---

[2] The state court had thus far only issued a draft showing a proposed judgment.

10

Hardy's renewed motion for summary judgment and a motion to bifurcate the trial. [*See* ECF Nos. 99 and 109.] The bankruptcy court determined: "The Court believes it would be an inefficient use of its time and that of counsel for the parties to hold a trial on the question of dischargeability of a debt based on a judgment that is pending on appeal and therefore subject to being reversed." [ECF No. 109.]

On November 25, 2014, the bankruptcy case and this adversary proceeding were assigned to the current judge. The Hardys again moved for summary judgment in early 2015, alleging the state court action was complete. [ECF No. 128.] A status conference was held and the matter was again continued because it was not clear the state court appellate process was finished. [ECF No. 127.][3]

On November 5, 2015, the Halpins filed a notice of the final opinion from the Kentucky Supreme Court. Although there was some hesitation from the Halpins, it was eventually determined that the appeals process was complete and this adversary proceeding could move forward. In December 2015, Susan Hardy was dismissed as a party. [ECF No. 142.]

The Halpins and Hardy each filed motions for summary judgment that came on for hearing on February 9, 2016. Each party argued that issue preclusion allowed judgment in their favor on the relevant issues. [*See* ECF Nos. 146, 151, 154, 156, and 160-163]. The summary judgment motions were denied because there were still genuine issues of material fact. [ECF No. 167.] The jury instructions, interrogatories and judgments on which the parties relied did not go far enough to warrant preclusive effect to any of the elements in a § 523(a)(2)(A) action.

---

[3] The minutes indicate an order would be submitted for the Court's consideration. No order was ever tendered or entered to document the oral decision.

Intent and other issues depend on the credibility of the witnesses in determining how to interpret the alleged statements and omissions.

The order on the motions for summary judgment also documented the Halpins' agreement that Count II and Count III of the Complaint [ECF No. 1], which dealt with issues in the 2005 Case, were no longer viable based on rulings in the state court.  [ECF No. 167.]  The Halpins also confirmed that they were seeking non-dischargeability of the Judgment Debt in Count I of the Complaint, i.e., the final judgment in the 2003 Case after the second jury trial. [*Id.*]

### F.    The Non-Dischargeability Trial.

The trial was held on June 8-10, 2016.  The Court entered an oral ruling on issues regarding the expert witness testimony of John Russell and certain related exhibits, which is incorporated into this Opinion at Part III.  Admission or exclusion of all proposed Exhibits is addressed in an Order entered after the hearing.  [ECF No. 248.]  A post-trial motion to reconsider exclusion of certain exhibits from Hardy was denied.  [ECF No. 255.]  The facts and opinions presented at the trial are addressed in this Opinion.

## II.    JURISDICTION.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. § 1409.

## III.    EXPERT TESTIMONY.

### A.    Objections to the Expert Testimony of John Russell.

Hardy's expert, John Russell, drew multiple objections from the Halpins because his description of the standards for a high definition television in 2002 conflicted with the information provided by Hardy, among other proof.  Further, the Halpins did not believe he was

qualified as an expert.  After direct and cross-examination regarding Russell's qualifications, he was allowed to testify.

The Halpins still raised issues regarding Russell's expertise and the content of his testimony.  The Halpins indicated that admission of his opinions would impact whether they would present their own expert witnesses or other testimony.[4]  Based on this, a preliminary ruling was read into the record, reserving the right to make grammatical changes in a final opinion, or other necessary alterations that would avoid a clear error of law.  That ruling is now repeated in Part III.B, with changes from the oral presentation noted with brackets.

**B.**       **Oral Ruling Made June 9, 2016**.

Under Federal Rule of Evidence 702 [and 703], I have to determine if the expert, Mr. Russell, has a reliable basis in the knowledge and experience of the relevant discipline.   The Defendant's trial brief [ECF No. 184 at 2] provides that Russell will testify to:

> **John Russell**, who is expected to testify as an expert in the consumer electronics industry, and is expected to testify as to his opinion of industry standards for the marketing of high definition products in 2002, particularly 480p plasma televisions. He will also testify about what specifications affect good picture quality, specifically specifications available in 2002 when the Halpins purchased the ReVox E-650, and otherwise in accordance with the Supplemental Interrogatory answers served by Defendant on April 13, 2016, a true copy of which is attached hereto as **Exhibit A**. His testimony may be live or may be by deposition.

The expert's report at ECF No. 211 provides additional clarification on the opinions Russell [will] provide.  The court is required to consider whether Russell ha[s] sufficient knowledge to address the proposed areas of testimony.  FED. R. EVID. 702 [and 703]; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-50 (1999).

---

[4] The Plaintiffs allowed the Defendant to present Russell's testimony before they had closed their case because Russell had other commitments.

Therefore, the parties initially addressed Russell's qualifications. There is broad discretion and a federal court is directed to use liberality and flexibility to construe the evidence in this regard. We are not in the realm of scientific testimony, which at least in this case makes the analysis more difficult.

Lack of knowledge of specific issues, for example, FCC orders and pronouncements, does not disqualify an expert if he has general knowledge of the field. Based on the testimony presented, I determined there was sufficient information to conclude Russell had knowledge of the issues for which he would testify through experience in the field in 2002. Once qualified, lack of strong qualifications goes to the weight of the evidence.

The other question is whether the information is reliable. This may be the cause of the Plaintiffs' focus on the articles that the Defendant has attempted to introduce through the expert witness. [*See* Def. Exs. 14-17 at ECF No. 179-14 – 179-17; Def. Exs. 38-39 at ECF No. 250 (collectively the "Articles").] The general rule on the admissibility of the exhibits as I understand it [is as] follows.

Information that forms the basis of an expert's opinion must be reasonably relied upon by other experts in his field. FED. R. EVID. 703. Even if the [A]rticles meet this threshold, they are not by virtue of an expert's opinion substantive evidence and they may only be substantive evidence if otherwise admitted into evidence. 5 Michael H. Graham, HANDBOOK OF FED. EVID. § 703:1 (7th ed. 2015). *See also Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721 (6th Cir. 1994) (Rule 703 does not permit admission of materials, relied on by an expert witness, for the truth of matters they contain if the materials are otherwise inadmissible). Facts or data found in the literature

of a profession, even though not admissible in evidence, may form the basis of an

expert's opinion. *Nanda v. Ford Motor Co.*, 509 F.2d 213 (7th Cir. 1974). This can

include literature and information furnished to the expert by counsel. *Mannino v. Int'l*

*Mfg. Co.*, 650 F.2d 846, 853 (6th Cir. 1981). But the expert may only testify concerning

these published materials to establish the basis of his opinion and not the veracity of the

materials. *Hickok v. G.D. Searle & Co.*, 496 F.2d 444 (10th Cir. 1974).

The Articles are inadmissible hearsay and no exception applies. Russell may

testify that he relied on these Articles in forming the basis of his opinions, but the

Articles are excluded as evidence. I ruled on the record that [Defendant's] Ex[hibit] 17

was excluded because it was hearsay and I saw no way it could have informed his

opinion in 2002. The other Articles are closer in time, but Russell testified that he found

these Articles by searching the internet for articles that supported his position after he

was retained. The sole purpose of the Articles appears to be an attempt to merely bolster

his opinion rather than inform it. But this will go to the weight of his testimony and not

the admissibility.

Therefore, there is insufficient information in the record to support admission of

these Articles and the Plaintiffs['] objections are sustained.[5] Still, in most respects, the

witness was testifying to his opinions for the relevant time period – 2002. I do not have

issues with either reliability or helpfulness based on exclusion of these exhibits.

The Defendant also attempted to introduce Exhibit 37 as demonstrative evidence.

I do not understand the exhibit, so there is no way to see its relevance. Rather than

---

[5] The Defendant filed a post-trial motion to reconsider exclusion of these exhibits [ECF No. 249], which was denied
by a separate order [ECF No. 255].

simply exclude it, however, I see little harm including Exhibit 37 because it is always

possible reconsideration of the evidence in preparation for an opinion might suggest a use

for the information.  But I expect it will receive no weight in my decision.  Exhibit 37 [is]

admitted.[6]

The Plaintiffs attempted to introduce Supplemental Exhibit No. 5 on cross-

examination, which is a press release from the Consumer Electronics Association, a large

trade organization for the industry.  [ECF No. 222.]  Although Russell indicated he was a

member of this organization and received information, he did not recognize this specific

press release.  This [press release] is also inadmissible hearsay and there is insufficient

information to support introduction of this exhibit into evidence.  I do not have any issues

with use of [the] document during questions, however, as the Defendant initiated the

problem with his inadmissible evidence.

### C.    Consideration of, and Weight Given to, Russell's Opinions.

Russell did not have significant knowledge of the workings of the FCC or its orders and

pronouncements, even though Hardy had already admitted the orders and pronouncements of the

FCC were valid and applicable.  Further, Russell relied on standards put out by the Society of

Motion Picture and Television Engineers (referred to in the trial at times as "SMPTE"), but he

had no significant knowledge about this entity or why its pronouncements are relevant.

Russell's testimony regarding the standards for high definition products does not,

therefore, impact this decision.  While not excluded, his opinions in this regard are given no

weight.  The only limited weight given to Russell's testimony relates to his opinions regarding

the marketing and sales of high definition products during the relevant time period of 2002.

---

[6] Exhibit 37 was given no weight in this decision.

**IV.**     <u>**SECTION 523(a)(2)(A) AND THE BURDEN OF PROOF**</u>.

"A discharge under section 727....of this title does not discharge an individual debtor

from any debt- …

> (2)  for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained, by

> (A)  false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtors or an insider's financial condition...

11 U.S.C. § 523(a)(2)(A).

The Halpins must prove the following to succeed by a preponderance of the

evidence:

> (1) Hardy obtained money through a material misrepresentation that, at the
> time, Hardy knew was false or made with gross recklessness as to its
> truth;
> (2) Hardy intended to deceive the Halpins;
> (3) the Halpins justifiably relied on the false representation; and
> (4) the Halpins reliance was the approximate cause of their loss.

*See Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-281 (6th

Cir. 1998).  Exceptions to discharge are strictly construed against the creditor.  *Id.* at 281.

**A.**     <u>**Material Misrepresentation, Misleading Omissions, and Actual Fraud**</u>.

The Halpins' burden under § 523(a)(2)(A) first requires a showing of express

misrepresentations, misleading omissions, or actual fraud.  *Haney v. Copeland* (*In re Copeland*),

291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003).  A material misrepresentation is defined as

"'substantial inaccuracies of the type which would generally affect a [creditor's] decision.'"  *Id.*

at 761 (*citing Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir.

1996)).  A misrepresentation is not material if the creditor knows it is false or has sufficient

information to call the representation into question.  *Id.*  Puffery and opinion do not rise to the

17

level of material misrepresentation because such statements are not the "essence" of the

transaction. *Id*. at 762.

"'False representations and pretenses encompass statements that falsely purport to depict

current or past facts.'" *Id*. at 760 (*citing Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd),* 34 B.R.

633, 635 (Bankr. W.D. Ky. 1983). In contrast to express representations, false pretenses include

statements that involve an implied misrepresentation or conduct intended to create or encourage

a false impression. *Id.* Actual fraud includes any deceit, artifice, trick, or design used to cheat or

deceive another. *Id.*

### B.      Knowingly False or Made with Gross Recklessness.

The Halpins must also prove Hardy knowingly made false misrepresentations or acted

with gross recklessness as to the truth. *Rembert*, 141 F.3d 277 at 280-281. "Knowing" means

"'[h]aving or showing awareness or understanding'" and "includes conscious or deliberate acts."

*Copeland*, 291 B.R. at 763 (citing BLACK'S LAW DICTIONARY 876 (7th ed. 1999)). "Gross

recklessness"[7] is defined as "'[c]onscious indifference to the consequences (of an act).'" *Id.*

(*citing* BLACK'S LAW DICTIONARY 1276 (7th ed. 1999)). Gross recklessness is narrowly

construed. "A 'line is to be drawn between an intent to mislead and mere negligence. An honest

belief, however unreasonable, that the representation is true and the speaker has information to

justify it [has been] held ... to be no sufficient basis for deceit.'" *Id.* (*citing Nat'l City Bank v.*

*Manning (In re Manning),* 280 B.R. 171, 191 (Bankr. S.D. Ohio 2002) (*quoting Chevy Chase*

*Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 787 (B.A.P. 10th Cir. 1998))).

---

[7] The *Copeland* court refers to this requirement as "reckless disregard" in its discussion of the elements. Because
the *Copeland* court adopted the *Rembert* factors without limitation, *see* 291 B.R. at 760, "reckless disregard" is
synonymous with "gross recklessness."

The Halpins' burden of proof on this element of § 523(a)(2)(A) is different than what the

Halpins were required to prove to the jury under the KCPA in the 2003 Case.  The KCPA applies

only where there is "some evidence of 'unfair, false, misleading or deceptive acts'" and "some

element of intentional or grossly negligent conduct is also present." *Capitol Cadillac Olds, Inc.*

*v. Roberts*, 813 S.W.2d 287, 291 (Ky.1991) (*citing Dare to Be Great, Inc. v. Com.*, 511 S.W.2d

224 (Ky. 1974)).  Gross negligence under the KCPA and gross recklessness under § 523(a)(2)(A)

are not the same.

Kentucky courts have construed "gross negligence" to mean "'wanton or reckless

disregard for the safety of other persons.'" *M.T. v. Saum*, 3 F. Supp. 3d 617, 623 (W.D. Ky.

2014) (*quoting Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389-90 (Ky. 1985)).

In contrast, federal bankruptcy courts have construed "gross recklessness" to require a higher

degree of culpability considered the "evidentiary equivalent of intent to deceive."  *First Nat'l*

*Bank of Centerville, Tennessee v. Sansom (In re Sansom)*, 224 B.R. 49, 57 n.11 (Bankr. M.D.

Tenn. 1998); *see also Farmers Nat'l Bank of Cynthiana v. Lockridge (In re Lockridge)*, Bankr.

No. 11-50922, Adv. No. 11-5041, 2012 WL 1969254, *13 (Bankr. E.D. Ky. May 31, 2012).

## C. <u>Intent to Defraud</u>.

Third, the Halpins must show by a preponderance of the evidence that Hardy intended to

defraud them.  Whether a debtor possesses an intent to defraud a creditor within the scope of

section § 523(a)(2)(A) is measured by a subjective standard.  *Rembert,* 141 F. 3d. at 281.

Hardy's intention or lack thereof is ascertained by the totality of the circumstances.  *Id.* at 282.

The Halpins may establish fraud by direct, as well as circumstantial evidence.  *See Bluegrass*

*Stockyards of Campbellsville, LLC v. Smith (In re Smith)*, 429 B.R. 864, 870 (Bankr. W.D. Ky.

2010).

The Halpins were not required to prove actual deception to prevail under the KCPA in state court.  *See Telcom Directories, Inc. v. Com*., 833 S.W.2d 848, 850 (Ky. App. 1991) (no proof of actual deception is necessary to find a violation under the KCPA).  In contrast, they must prove Hardy intended to defraud them to prevail under § 523(a)(2)(A).

### D.   **Justifiable Reliance**.

Fourth, the Halpins must prove that they justifiably relied on the material misrepresentation.  *Field v. Mans*, 516 U.S. 59 (1995).  "'[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"  *Id.* at 70 (*quoting* RESTATEMENT (SECOND) OF TORTS § 540 (1976)).  Justifiable reliance is therefore "'a matter of the qualities and characteristics of a particular plaintiff and the circumstances of the particular case, rather than application of a community standard.'"  *Id*. at 70-71.  Justifiable reliance is not automatic, though, because "a person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'"  *Id.* at 71.

### E.   **Proximate Cause of Loss**.

Finally, the Halpins must establish Hardy's "conduct was a substantial factor in the loss, or the loss may be reasonably expected to follow."  *Williams v. Logan (In re Logan)*, 313 B.R. 745, 749 (Bankr. S.D. Ohio 2004).

## V.      ANALYSIS.

### A.      Hardy Did Not Make Material Misrepresentations Knowingly or with Gross Recklessness to the Truth as Defined by § 523(a)(2)(A).

The crux of the Halpins' case is that they told Hardy they wanted a high definition 50-inch plasma television screen and Hardy knowingly or with gross recklessness misrepresented to them that the ReVox E-650 was a high definition television screen. The evidence shows the ReVox E-650 is not a native high definition television screen. The proof calls into question whether the Halpins emphasized the importance of high definition to Hardy. Even if they did, the fact that the ReVox E-650 is not a native high definition television screen does not require a conclusion that Hardy acted knowingly or with gross recklessness by making materially false misrepresentations to the Halpins, express or implied, or that Hardy committed actual fraud. Hardy adequately explained how the characteristics of the ReVox E-650 met the Halpins' needs as he understood them. The proof does not show Hardy committed fraud by a preponderance of the evidence.

### 1.      The ReVox E-650 was Not a Native High Definition Television Screen.

High definition television was an emerging technology in the television broadcast industry in 2002. According to the Federal Communications Commission First Report and Order and Further Notice of Proposed Rule Rulemaking adopted January 18, 2001 ("FCC Report"), the authority of which Hardy conceded at trial: "The electronics industry and ATSC [Advanced Television Systems Committee] define high definition television as having a vertical display resolution of 720p, 1080I, or higher; an aspect ratio capable of displaying a 16:9 image at the minimum resolution level; and receiving and reproducing Dolby digital audio." [Pl. Suppl. Ex. 10 at ECF No. 222-10.]

The footnote to this statement further provides:

> Both high resolution formats use a picture aspect ratio of 16 units horizontally by 9 units vertically.  The choices of 1280 pixels per line for the 720-line format and 1920 pixels per line for the 1080-line format result in square pixels for both formats, based on the 16:9 aspect ratio.  "I" designates "interlaced" scanning and "P" designates "progressive" scanning.  Progressive scanning lines are presented in succession from the top of the picture to the bottom, with a complete image sent in each frame as is commonly found in computer displays today.  For interlaced scanning, which also is used in NTSC (analog) television, odd and even numbered lines of picture are sent consecutively, as two separate fields.  These two fields are superimposed to create one frame, or complete picture, at the receiver.

[*Id.* at n. 204.]

The FCC also recognized the market had "118 HDTV displays (monitors) available to consumers, each of which may be combined with set-top boxes to provided HDTV and is capable of 1080i or 720p displays; … and 24 monitors capable of displaying 480p (not HDTV)." [Pl. Supp. Ex. 9, ¶ 10 at ECF No. 222-9.]

Thus, the evidence indisputably shows that in 2002 a high definition television screen had a vertical display resolution of 720p or higher.  Hardy conceded the resolution of the ReVox E-650 was only 480p, so it is not a high definition television screen based on this definition.  The Halbig Letter also offered to replace the ReVox E-650 with a "High Definition model," confirming the ReVox E-650 is not a high definition television screen.   [Def. Ex. 10 at ECF No. 179-10.]

Further, the Halpins proved the ReVox E-650 did not, and could never, show a broadcast in 720p resolution.  The ReVox E-650 could only show a high definition signal by converting the signal to its 480p native resolution.  The Halpins, therefore, believe they are entitled to a directed verdict, or at least a judgment in their favor.

But proving the ReVox E-650 is not a native high definition television screen or that it cannot show a high definition picture without an HD tuner does not compel a conclusion that Hardy knowingly or with gross recklessness misrepresented the characteristics of the ReVox E-650, expressly or impliedly, or committed actual fraud.  Hardy credibly testified that he did not represent the ReVox E-650 was a native high definition television screen, but explained it is capable of receiving and displaying a high definition broadcast signal in 480p with the aid of an HD tuner.

> **2.      The Proof Does Not Support a Finding that Hardy Acted Knowingly or with Gross Recklessness to Deceive the Halpins.**
>
> **a.      There is Insufficient Proof that Hardy Represented the ReVox E-650 was a High Definition Television Screen.**

All the fact witnesses testified credibly.  Considering their testimony as a whole, and the evidence introduced into the record, the more reasonable conclusion to draw from the conflicting testimony and different interpretations is that there was a miscommunication about the high definition capabilities of the ReVox E-650, rather than an intentional or grossly reckless misrepresentation that rises to the level of fraud under § 523(a)(2)(A).

The Halpins testified that they told Hardy they wanted a high definition television screen prior to the March demonstration.  Hardy, Powers, and Tucker all spoke to Ms. Halpin prior to the March demonstration and testified that the Halpins were more concerned with the aesthetics of the system.  They have no recollection of a specific request for a high definition television screen from the Halpins.  Hardy testified that it was his knowledge of the changing industry that led him to understand the need for high definition capability in any product the Halpins would purchase, not a specific request by the Halpins.

Hardy, Powers, and Tucker each testified that high definition did not become a topic of conversation until the March demonstration when the parties were discussing the limited television shows broadcast in high definition.  Tucker testified he would have explained the unique features of the ReVox E-650 to the Halpins during this demonstration.  He further explained to the Halpins that the ReVox E-650 was "HD ready" because it was capable of displaying a high definition picture in its native resolution of 480p.

Hardy testified consistent with Tucker and denied ever telling the Halpins that the ReVox E-650 could display a high definition signal in any resolution other than its native resolution of 480p, which is not high definition.  Hardy testified that he explained the need for an HD tuner, which could come from the cable or satellite company, to view any channel broadcast in high definition, but the Halpins were uninterested in purchasing one at that time.

Powers said he never heard Hardy say the ReVox E-650 was high definition during the course of the March demonstration.  Powers explained that Hardy was a "technical guy" that gave long explanations about how things work that was often "over the top."  When questioned about prior testimony, Powers reiterated:   "I don't ever specifically remember Bill Hardy saying that it is a high definition television screen.  I always remember because like I said Bill was a technical guy and he'll talk your leg off about it until you're sick of hearing it."  Powers stuck to the accuracy of his descriptions of Hardy's explanations despite assertions his previous testimony was potentially contradictory.

The Halpins have not proven that they emphasized the need for a high definition television screen in their initial conversations with Hardy (or Powers or Tucker) as they recalled in their testimony.  This conclusion is supported by the omission of any allegations addressing the high definition nature of the system in the original Complaint filed in the 2003 Case.  [Def.

24

Ex. 32 at ECF No. 179-24.]  Instead, the Complaint only alleged the "entertainment system" was not state-of-the-art or the best system available and it did not function properly.  [*Id.*]

Ms. Halpin also said the Halbig Letter was the first time she knew the ReVox E-650 was not high definition during testimony regarding the November Halbig Letter and Halpin Letter. This potentially undermines Hardy's testimony that he told Ms. Halpin of the need for an HD tuner, but it also reasonably suggests the Halpins simply did not know enough about high definition television, and their capabilities in 2002 to understand Hardy's technical explanations.

Hardy's, Tucker's, and Power's testimony shows a collective and common understanding that the ReVox E-650 could accept a high definition signal, but only display the signal in its native resolution.  They also consistently testified that they explained this to the Halpins.  It is not hard to conclude that consumers such as the Halpins may not have fully understood the explanations, especially during a time when high definition was an emerging technology rather than commonplace as it is today.  This might have allowed a finding of fault under the KCPA, but any misunderstanding generated from the conversations at the March 2002 demonstration does not make Hardy's statements fraudulent.

The evidence does not support a conclusion that the Halpins proved by a preponderance of the evidence that they emphasized the need for a native high definition television set or that Hardy knowingly or with gross recklessness represented the ReVox E-650 as a native high definition television screen to deceive them.  It is as, or more, likely that Hardy explained the ReVox E-650 could receive a high definition signal and display the signal in its native resolution and Hardy's explanations were not fully understood by the Halpins.

**b.    The Critical Communications Between the Halpins and Hardy were Relayed through Powers.**

There is a more significant fact that leads to the conclusion the misunderstanding was not intentional or fraudulent:  the method of communication between the Halpins and Hardy.  The majority of the communications between the Halpins and Hardy occurred through Powers.

Dr. Halpin was present at the March demonstration, but he testified that he let his wife act on their behalf regarding review of the proposals and the purchase and installation of the system.  Therefore, the Halpins did not prove by a preponderance of the evidence that any representation or omission involving Dr. Halpin was material or the proximate cause of the Halpins' loss.

Ms. Halpin's communications with Hardy were primarily through Powers.  Ms. Halpin testified that she met with Hardy four times: (a) approximately 15-30 minutes in March; (b) the March demonstration; (c) the August meeting at her home; and (d) the November meeting at her home.  She also said she only spoke to Hardy on the phone once in the Spring and twice in the Fall.  All other communications were passed through Powers.  Ms. Halpin testified that Hardy's proposals for the television and entertainment system were delivered by Powers and any day-to-day communications during the pre-wiring period (before the June installation) and through August were all conducted with Powers.

The Halpins claim they told Hardy about their needs and problems with the ReVox E-650, but the testimony leaves sufficient doubt that the information was relayed accurately, either as intended or at all, on either side.  If the Halpins did ask for a high definition television screen, Powers testimony confirms that he did not relay that request to Hardy.  Further, Powers testified that his understanding of the Halpins' needs focused on the aesthetics of the entertainment system, not on the television's ability to display high definition signals.  Powers

relayed their concerns to Hardy after the installation as concerns about the cable feed, which

directly related to Hardy's comments about the need for an HD tuner.  It is not hard to conclude

that the failure of Ms. Halpin to speak directly to Hardy about her concerns significantly

contributed to this miscommunication.

> **3.      Hardy Credibly Testified that He Believed High Definition Meant High Definition Capable.**

Regardless of the emphasis the Halpins may or may not have placed on high definition,

and the manner it was relayed, Hardy testified that his understanding of their request for the best

available, state-of-the-art television system includes high definition.  But his explanation of what

high definition meant to him in this context further undermines any suggestion that he

fraudulently misrepresented the characteristics of the ReVox E-650 to the Halpins.

Hardy credibly testified that he believed the high definition capability of the entire

entertainment system, including its other enumerated features, would satisfy the Halpins' desire

for a state-of-the-art, best available system.  This belief was shared by Tucker.  Hardy also

credibly testified that he thought the Halpins primarily planned to use the ReVox E-650 to watch

DVDs, which were made in the same resolution as the ReVox E-650 in 2002.  Hardy believed

the ReVox E-650 met the Halpins' needs as he understood them.

The Halpins believe the various versions of the proposals show that Hardy was trying to

mislead them into believing the ReVox E-650 was a high definition screen.  [Def. Ex. 12 at ECF

No. 179-13, pp. 13-14; Pl. Ex. 2 at ECF No. 175-2]  Hardy knew the Halpins would also watch

occasional sporting events and at least some network television broadcast in high definition on

the ReVox E-650.  This was not possible in 2002 without a separate HD tuner because no tuners

were built into television screens at that time, but the proposals do not include an HD tuner.

This omission does not support a finding of fraud by a preponderance of the evidence. The prior discussion concluded it was more likely than not that Hardy explained the need for a separate HD tuner that could come from a different supplier or a cable or satellite provider. Further Powers said he reiterated the need for an HD tuner when Ms. Halpin discussed the picture quality issues after installation.  Ms. Halpin acknowledged Powers investigated the television she viewed on the parade of homes tour and told her the set-top box from a satellite provider was the reason that a system had a clearer picture

The Halpins also emphasized their reliance on certain language in the proposals.  The proposals refer to "hdtv transmission" cables and an "hdtv breakout."  [*Id.*]  The Halpins suggest the use of the term "hdtv" for cables and the breakout in the proposals led them to believe the screen was high definition.  Delivery and acceptance of the proposals through Powers makes it harder to place blame on Hardy for any fault with the descriptions in the proposals.  Hardy also plausibly explained that the "hdtv" components referenced on the proposals confirms his intention to prepare the Halpins' system should they choose to purchase an HD tuner in the future.  Powers confirmed this and characterized it as "future proofing."

The omissions have weight when considered with other testimony, but any value is minimized by Hardy's and Powers' explanations.  The Halpins did not prove by a preponderance of the evidence that Hardy intentionally, or with gross recklessness, misrepresented the capabilities of the ReVox E-650 television screen to defraud the Halpins.

**B.**     **There is Insufficient Proof Hardy Intended to Deceive the Halpins.**

The Halpins also attempted to show Hardy intended to deceive them in other, more isolated ways in addition to the evidence previously discussed, but based on the totality of the circumstances, this evidence does not show a deceitful intent.

1.    **Demonstrating a 42-inch Screen with a DVD Does Not Suggest Intent to Deceive.**

Hardy and Tucker explained that they used a 42-inch screen at the March demonstration because Tucker did not have a 50-inch screen available.  Tucker explained that hauling plasma screens around for demonstrations caused wear on the products.  Also, ReVox satisfied demand in its larger European market first, so very few 50-inch screens were shipped to America for sale. It is easy to understand why Tucker would limit risk of loss on a demonstration screen when the cost is so high and the number of available screens so few.

Further, the Halpins knew that the demonstration would involve a 42-inch screen and not the 50-inch screen.  There was no attempt to pull the wool over their eyes when use of the smaller model was fully disclosed.

2.    **Only Selling ReVox Products Does Not Suggest Intent to Deceive.**

Hardy could only sell ReVox plasma screens in 2002.  The Halpins believe this fact deserves a negative inference that shows Hardy deceived them. This fact, in light of the other evidence, does not go far enough to show a deceitful intent.  There is no proof Hardy prevented the Halpins from discovering what products he could sell in his store or making their own comparisons.

3.    **Representations Regarding Side-by-Side Comparisons Does Not Suggest Intent to Deceive.**

The Halpins testified that Hardy represented that he had done side-by-side comparisons of the various products on the market.  The Halpins argue this statement suggested that Hardy had investigated other products when he had not.  But Hardy denied he ever indicated he conducted side-by-side comparisons.  This statement is attributable to Tucker, who admitted the statement based on his comparison of competing products at an exposition earlier in 2002.

Further, the Halpins had performed their own investigation prior to purchasing the

ReVox E-650.  They traveled to Chicago to view Panasonic, Pioneer, and Bang and Olufsen.  It

was reasonable for Hardy to believe the Halpins had some ability to do their own comparisons.

Thus this proof does not support a finding that Hardy intended to deceive the Halpins.

### 4.     Hardy's Profit from the Sale Does Not Suggest Intent to Deceive.

Hardy admitted this was a very significant sale for Bill Hardy Stereo.  But that fact alone,

or together with the other circumstances of this case, does not mean Hardy intended to defraud

the Halpins.  There is nothing deceitful about making a profit off a product sold.

### C.     The Totality of the Circumstances Favors Hardy.

While the proof may support a jury finding that Hardy violated the KCPA, the proof does

not support a finding that the state court judgment is non-dischargeable.  Both sides presented

credible testimony.  But the Halpins have the burden of proof and exceptions to discharge are

strictly construed against the creditor.  The Halpins have not provided enough uncontradicted

facts to make it more likely than not Hardy intended to defraud them.

It is not clear the Halpins' needs and desires were effectively communicated, which is

just as much the fault of the Halpins as Hardy.  The Halpins' testimony requires significant

reliance on hindsight, which makes their testimony harder to accept as proof against Hardy in a

§ 523(a)(2)(A) action.  In hindsight, Hardy was perhaps a bad salesman, and perhaps wrong

about his choice of the ReVox E-650 product based on what is now known about the Halpins'

desires.  These possibilities do not, however, rise to the level required to find the Judgment Debt

is non-dischargeable.  The Halpins did not meet their burden by a preponderance of the evidence.

D.    <u>**Certain Information Has No Weight in this Opinion**</u>.

It is worth recognizing some of the evidence that did not impact this decision.  These

matters are selected for specific comment because it appeared one party or both parties believed

they should affect the decision based on the emphasis in their presentations.

1.    **Developing Animosity.**

Hardy made a significant effort to present testimony involving harsh words directed by

Dr. Halpin at Hardy and Tucker in November 2002.  The Halpins sought to exclude such

information in a motion in limine [ECF No. 224] and through multiple objections at the trial.

The motion in limine was denied prior to the hearing, without prejudice to the right of the

Halpins to object at the trial.

Hardy was allowed to present testimony regarding the meeting between Dr. Halpin,

Hardy and Tucker at the Halpins' home in November 2002.  It is not surprising Dr. Halpin was

unhappy with the television system or that he described the system with one or more derogatory

terms.  The Halpins purchased an expensive system that had not lived up to their expectations.

The telephone call thereafter between the Halpins and Hardy that resulted in threats of

litigation, yelling and an abrupt termination also does not affect this decision.  The animosity that

had developed by November 2002 has no impact on this ruling.

2.    **Halpin Settlement Letter.**

Dr. Halpin sent a letter to Hardy suggesting they resolve the dispute by a refund of all

money paid.  The Halpin Letter [Def. Ex. 9 at ECF No. 179-9] did not refer to Hardy and blamed

the problems on ReVox and Tucker.  Mr. Halpin provided credible testimony that explained he

omitted blame against Hardy because he was trying to resolve the issue quickly and did not want

to immediately offend the party that received the payment.  This is a reasonable position that many or most take at the start of any negotiating process.

Any request for a discount if a replacement screen was provided also carries no weight.  Further, the settlement efforts in general do not affect the findings.   If settlement efforts mattered, then the fact Hardy made the Judgment Payoff in 2006 would require a decision in Hardy's favor.  What matters are Hardy's actions related to the sale of the ReVox E-650 and the related system, not what he did when the Halpins expressed dissatisfaction.

### 3.        Bankruptcies by Other Judgment Debtors.

Powers filed a bankruptcy petition after the First 2003 Judgment.  Testimony was elicited from Powers that confirmed the Halpins did not pursue a non-dischargeability action against him.  Efforts to collect from Powers, including in his bankruptcy case, does not impact the non-dischargeability of the Judgment Debt against Hardy.

## VI.    CONCLUSION.

The foregoing constitutes the Court's findings of fact and conclusions of law.  In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referred to in this decision.  A separate Order shall be entered accordingly.

32

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Friday, July 08, 2016**
**(grs)**